CHOY, Circuit Judge:
Appellant Chong In Kim was convicted on December 4, 1992, in the United States District Court for the District of Hawaii of possession of various narcotics with intent to distribute under 21 U.S.C. § 841(a)(1) and possession of firearms in connection with the use and trafficking of controlled substances under 18 U.S.C. §§ 922(g)(3) and 924(c)(1). Sentenced to 108 months in federal prison, Kim challenges two aspects of the district court’s ruling and one aspect of sentencing, including: The judge’s failure to find that Kim was arrested pursuant to an illegal, race-based stop; the finding that Kim consented to be searched; and the enhancement of Kim’s sentence on the basis of contraband suppressed at trial as the fruit of an illegal search and seizure.
I.
Kim’s conviction arises out of an investigation conducted by the Drug Enforcement Administration (DEA) in the McCully district of Honolulu. Agent Aiu testified that this investigation was prompted by a tip informing the DEA that on November 13, 1991 a male Korean, five-feet six to five-feet seven in height, in his mid-twenties or early thirties, would be carrying several ounces of methamphetamine (“ice”) in the vicinity of the Chun Soo Herb Center at 808 Sheridan Street and the adjoining gift shop. After two and a half hours of surveillance outside this shopping center, Agent Barlow alerted other agents to the existence of a brisk traffic in persons of Korean appearance going in and out of the herb center and gift shop. Agent Barlow had previously spotted Kim and a companion, Stuart Machado, exit from the gift shop carrying a suitcase and seat themselves in an automobile parked in front of the two shops on a public street.
As Agent Aiu arrived in response to Agent Barlow’s call, he parked his unmarked car so as to block partially the egress of Kim’s vehicle. Agent Aiu then approached the driver’s side of the car opposite Kim, identified himself as a DEA agent, and requested leave to ask some questions. After Machado claimed not to have his driver’s license with him, Agent Aiu asked Kim for identification, to which Kim responded that his name was “Mr. Oh.” Hesitating to open the wallet he produced, Kim stopped and claimed that the wallet belonged to a friend before relenting and giving his real name.
With onlookers gathering nearby, Agent Aiu asked the two men to step out of the ear for further questioning. With Agent Barlow beside him, Agent Aiu then requested and received from Kim permission to see the contents of the suitcase, whereupon Kim retrieved the suitcase from the trunk and hand= *1429 ed it to the agents. Finding the suitcase empty, Agent Aiu paired off separately with Kim for further questioning.
Agent Aiu then noticed an unidentified object protruding from Kim’s pocket, moved closer to Kim and, according to the agent’s version, only pointed toward the protrusion. Kim contends that Agent Aiu touched the object’s outline through Kim’s trousers before being told it was a lighter. In response to Agent Aiu’s request that Kim remove the object, Kim handed the agent a silver container. When Kim did not object to the agent’s request to open the vial, Agent Aiu looked inside and found several grams of what he recognized to be crystal methamphetamine. Asked about the substance, Kim acknowledged that it was ice and requested to ' speak to Agent Aiu privately. In the discussions that followed Kim offered his cooperation and information about future shipments of ice to Hawaii. Advised by Agent Aiu of his Miranda rights, Kim agreed to talk to him outside the presence of an attorney. .
After Kim was instructed to drop Machado off nearby, a mix-up ensued in which Macha-do dropped off Kim and was pulled over by other federal agents. Kim’s vehicle was seized for forfeiture under federal law and when later searched was found to contain various firearms, including a revolver subject to this appeal, and a small amount of narcotics. A search of Kim at DEA headquarters revealed a pouch containing an additional 86.5 grams of ice, also subject to this appeal. Kim was then released with the understanding that he would cooperate with the DEA. Difficulties in establishing contact with Kim in the following weeks aroused DEA suspicions that he would renege on his offer.
On December 27, 1991, approximately one and a half months after Kim’s arrest, Honolulu police seized Kim in a separate incident at Honolulu International Airport after their suspicions were alerted by Kim’s attempt to purchase a one way ticket with cash and then heightened by the conflicting stories offered by Kim and his companions. After conferring with the DEA by telephone, the officers handed over to DEA agents for forfeiture proceedings a cellular phone and cash found on Kim, but released Kim when outstanding state warrants for traffic violations could not be confirmed.
Two days later an Agent Howard at DEA headquarters activated Kim’s telephone in order, he testified, to ascertain the telephone number displayed thereby. Several minutes later, a caller identifying himself as Kim’s brother informed Agent Howard, who claimed to be Kim’s friend, that a delivery man would be in Honolulu in five or six hours and that Kim was to provide hotel information. After ascertaining Kim’s approximate location through a confidential source, three DEA agents then proceeded to the hotel in which Kim and a companion, Julie Meneha-vez, were staying. After determining Kim’s room number, the agents knocked on the door and identified themselves as ■ police. Following a delay apparently prompted by the ailing Kim’s grogginess, they then threatened to knock down the door and continued their demands that Menchavez open up. When Menchavez opened the door and stood back from it, four officers rushed in with guns drawn and surrounded the naked and bedridden Kim.
According to Kim’s largely uncontested version of the event, the agents then subjected him to physical abuse and berated him for his lack of cooperation. The subsequent search of the room revealed a pistol, 348 grams of methamphetamine and a suitcase containing $85,000 in cash. After suppressing this evidence at trial as the fruit of an illegal, warrantless entry of Kim’s hotel room, the district court grouped the ice found there with amounts previously seized from Kim outside the herb eenter to raise his offense level from 30 to 34.
II.
A.
Kim’s first contention of error is that his conviction should be reversed because the weapons and 94 grams of methamphetamine seized from him by the DEA during their original encounter were derived from an illegal race-based investigatory stop.
*1430 Whether an encounter between an individual and law enforcement authorities constitutes an investigatory stop is a mixed question of law and fact subject to de novo review. United States v. Alvarez, 899 F.2d 833, 836 (9th Cir.1990), cert. denied, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991). Factual determinations underlying this inquiry are reviewed for clear error. United States v. Espinosa, 827 F.2d 604, 608 (9th Cir.1987), cert. denied, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988).
Kim’s first contention of error is mer-itless because the contact between DEA agents and Kim outside the herb center did not rise to the level of an investigatory stop. The record supports the district court’s ruling that this initial encounter was consensual and thus fell outside the. ambit of the Fourth Amendment’s guarantee against unreasonable searches and seizures, including those actuated by a suspect’s racial appearance.
Questioning by law enforcement officers constitutes an investigatory stop only if “ ‘in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.’ ” INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality). Law enforcement officers do not implicate much less “violate the Fourth Amendment by merely approaching an individual on the street ... [or] by asking him if he is willing to answer some questions.” Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality).
Central to Kim’s characterization of his initial encounter with Agent Aiu as non-consensual is his contention that Agent Aiu patted him down without permission. However, the record does not reveal to be clear error the district court’s factual finding that Officer Aiu merely pointed at the object in Kim’s pocket. Absent indicia of force or aggression, a request for identification or information is not a seizure or investigatory stop. See $25,000 U.S. Currency, 853 F.2d 1501, 1505 (9th Cir.1988). Finding no other evidence of undue intimidation or coercion in the record, we therefore agree with the district court that Kim’s initial encounter with the DEA was not an investigatory stop, racially motivated or otherwise.
On the contrary, the totality of circumstances described in the record supports the district court’s finding that the DEA refrained from coercive tactics which might undermine the consensual nature of the encounter and transform its initial questioning of Kim into a Fourth Amendment event. We are mindful that police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment. Mendenhall, 446 U.S. at 556-57, 100 S.Ct. at 1877-79. However, where, as here, officers come upon an already parked car, this disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense ab initio, except of his own volition. See id.[1]
*1431 To be sure, where officers detain an already stationary suspect by hindering his future as opposed to ongoing progress, that they did not stop the suspect as the term is commonly understood does not foreclose inquiry into whether their conduct constitutes an investigatory stop. See United States v. Berry, 670 F.2d 583, 597 (5th Cir.1982). However, that Officer Aiu partially blocked Kim’s egress with his automobile informs but does not alter our conclusion that Kim was not stopped in the constitutional sense before his surrender of the vial setting the foundation for the subsequent search and seizure of Kim and his automobile. See Pajari, 715 F.2d at 1380 (noting that the investigating officers “did not stop Pajari’s car but simply parked behind his car.”). The phrasing of Agent Aiu’s request for permission to question Kim left open the possibility of a refusal and the positions in which DEA agents were posted did not entirely bar Kim’s egress. See $25,000 U.S. Currency, 853 F.2d at 1504-05.[2]
Because we agree with the district court that Kim was not seized by the time the DEA discovered incriminating .evidence in his possession, whether racial appearance was a suspicional factor actuating their interrogation of Kim becomes immaterial. An investigatory stop requires a reasonable, “ar-ticulable suspicion that a person has committed or is about to commit a crime.” Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). Consideration of racial appearance alone cannot furnish a reasonable, articulable suspicion passing muster under the Fourth Amendment. United States v. Brignoni-Ponce, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 2582-83, 45 L.Ed.2d 607 (1975). However, where contact between the citizenry and law enforcement officials does not rise to the threshold of a Fourth Amendment event, the predicate for application of the exclusionary rule under Brignoni-Ponce is absent, the reasonable cause requirement nugatory, and the agent’s motivation for approaching Kim therefore ir-relevánt. See INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).[3]
B.
Kim next contends that the district court erred in finding that he consented to be searched. We disagree. The voluntariness of a defendant’s consent to search is a question of fact reviewed for clear error. United States v. Castillo, 866 F.2d 1071,1082 (9th Cir.1988). Whereas the burden is on the prosecution to demonstrate at trial that the defendant voluntarily consented to a *1432 search, on appeal we review the factual record in the light most favorable to the verdict. United States v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir.1985), cert. denied, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986).
Voluntariness is “based on the totality of circumstances surrounding the giving of consent.” United States v. Alfonso, 759 F.2d 728, 740 (9th Cir.1985). Viewed in the light most favorable to the Government, the totality of circumstances set forth in the record, including the DEA agents’ demeanor, tone, dress and concealment of weapons, persuade us that the district court correctly found that Kim consensually revealed the item in his pocket to Agent Aiu.
Factors this circuit has deemed to militate against a voluntariness determination include the fact that: (1) the defendant was in custody; id. at 741; (2) the arresting officers had their guns drawn, id., or otherwise overmastered the suspect; Alr-Azzawy, 784 F.2d at 895 (finding defendant forced to his knees at gunpoint not to have consented voluntarily); (3) Miranda warnings were not given prior to the search; id.; (4) the defendant was not told he had a right to withhold his consent to be searched; id.; and (5) the officers claimed that they could obtain a search warrant. United States v. Salvador, 740 F.2d 752, 757 (9th Cir.1984), cert. denied, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985).
Because the district court did not clearly err in finding that Kim was not yet seized or arrested when searched, the first factor pertaining to a suspect’s custody status does not militate against voluntariness. Similarly implicated only where the defendant is searched while in custody, see United States v. Ritter, 752 F.2d 435, 438 (9th Cir.1985), the third factor, failure to read the defendant his Miranda rights, therefore also fails to support involuntariness. While perhaps humiliating, a search conducted without offensive touching by two plain-clothes officers with guns holstered and concealed, in broad daylight on a public street in the presence of watchful observers potentially sympathetic to the suspect, is not clearly oppressive under the second factor. As to the fifth factor, pertaining to actual or readily obtainable col- or of authority, the officers did not claim to have a search warrant or to be able to obtain one immediately. By no means did they intimate that Kim’s withholding of consent would ultimately be futile or, eorrelatively, that his grant of consent, while perhaps a tonic to the interrogatory ambience, would thus be legally unprejudicial to him. See 3 Search and Seizure at § 8.2, 176-81.[4]
Therefore, arrayed against these several considerations, the only factor weighing in favor of involuntariness is the fact that the agents did not give Kim a discretionary pre-custody warning that he could refuse to be searched. A disposition turning on this one factor alone would, contrary to Mendenhall, effectively and categorically establish a Fourth Amendment analogue to Miranda warnings in the pre-arrest context. Recalling that no one factor is dispositive in the inquiry into consent, Castillo, 866 F.2d at 1082, we affirm the district court’s finding that Kim voluntarily consented to be searched.
C.
Kim’s third contention of error is that the district court improperly admitted at the sentencing phase 348 grams of methamphetamine suppressed at trial as derivative evidence from the illegal search of his hotel room, 803 F.Supp. 352. We disagree. Under 18 U.S.C. § 3661, the sentencing judge is not only permitted, but also required to consider all “relevant conduct” in setting the offense level under U.S.S.G. § 1B1.3. See *1433 United States v. Fine, 975 F.2d 596, 599 (9th Cir.1992) (en banc).[5]
A district court’s sentencing determination is subject to de novo review. Id. We review underlying findings of fact for clear error and give due deference to the district court’s application of the Guidelines to the facts. Id.
Kim’s third contention of error requires us to consider a difficult issue of first impression in this circuit: whether with the advent of the Federal Sentencing Guidelines (the “Guidelines”) the exclusionary rule applies to the sentencing phase to bar consideration of illegally seized evidence in the determination of the defendant’s offense level. Central to this inquiry is the interaction between 18 U.S.C. § 3661 and U.S.S.G. §§ 1B1.3-1.4. Predating the Guidelines and later incorporated into the Sentencing Reform Act of 1984, Pub.L. No. 98^73, Title II, 98 Stat. 1987 (1984), Section 3661 expresses Congress’ view that “[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.”
Governing selection of a sentence within the sentencing range corresponding to a given offense level, U.S.S.G. § 1B1.4 largely reiterates Section 3661, with the significant exception that under the former the sentencing judge may not weigh character or background evidence whose admission or consideration is “otherwise prohibited by law.”[6] Thus the Sentencing Committee incorporated into the Guidelines the view that the sentencing court may consider biographical information that the Guidelines do not take into account, while adding the proviso that applicable law not forbid consideration of such information. In contrast, U.S.S.G. § 1B1.3, governing the preliminary, ‘Vertical” ‘ selection of a defendant’s offense level, lacks such a preface or similarly limiting language.[7]
The plain language of the Guidelines therefore invites the interpretation that the “unless otherwise prohibited by law” limitation applies only to the determination of a sentence “horizontally” mthin a selected guideline range or the justifiability of departure from that range under U.S.S.G. § 1B1.4. Under this interpretation, notwithstanding prior applicable law lacking a constitutional dimension and barring reinstatement of the exclusionary rule’s former constitutional foundation, see United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1973), the carte blanche that Section 3661 invests in the sentencing judge for consideration of biographical information would therefore apply without modification or exception to the preliminary determination under U.S.S.G. § 1B1.3 of the applicable offense level, as opposed to the appropriate sentence within the corresponding sentencing *1434 range. See United States v. McCrory, 930 F.2d 63, 72 (D.C.Cir.1991) (Silberman, J. concurring in part and concurring in the judgment), cert. denied, - U.S. -, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992).
Because the district court’s ruling would be correct regardless of whether the applicable law limitation of U.S.S.G. § 1B1.4 is grafted onto U.S.S.G. § 1B1.3, we may leave to a more propitious case with a more developed record the resolution of this difficult issue of interpretation, which the parties did not address. Should we assume that Section 3661 does not permit or the Sentencing Committee did not intend applicable law to limit the sentencing judge’s consideration of background and character evidence in setting the defendant’s offense level, no conflict arises between 18 U.S.C. § 3661 and U.S.S.G. § 1B1.4. Therefore, no restriction would impede the sentencing judge from grouping the 348 grams of methamphetamine illegally seized at the hotel with the amounts previously found in Kim’s possession.
On the other hand, discerning in the cases cited by Kim no applicable restriction on the entry of illegally seized contraband into the sentencing calculus, we find no controlling precedent squarely precluding use of this additional contraband at sentencing. Therefore, the same result would obtain were we to adopt the contrary assumption that the applicable law limitation governs the sentencing judge’s determination of the offense level under U.S.S.G. § 1B1.3 as well.
To be sure, in Verdugo v. United States, 402 F.2d 599 (9th Cir.1968), cert. denied, 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971), we found in circumstances somewhat analogous to the instant case that the district court properly discredited the arresting officers’ assertion that a third person invited them in before they entered, seized the defendant and searched the premises with a considerable show of force. Id. at 610. Being concerned that unfettered admission of illegally seized evidence at sentencing would eviscerate the exclusionary rule, we remanded for resentencing without consideration of evidence whose location was known to police only on account of their prior unlawful entry.
Despite these factual similarities, the opposite result, use of the additional contraband at sentencing, is proper in the instant case, regardless of whether Verdugo qualifies U.S.S.G. § 1B1.3 or, alternatively, is superseded by Section 3661.[8] In Verdugo we recognized that categorical exclusion of the exclusionary rule from the sentencing phase would “provide a substantial incentive for unconstitutional searches and seizures.” Id. at 613. Undeterred by an exception to the *1435 rule against application of the exclusionary rule at sentencing, the Government would enjoy the choice between two equally promising avenues to the defendant’s prolonged incarceration, admission of evidence seized by dubious means at trial to support conviction of an additional offense or, should a motion to suppress be granted, enhancement of the defendant’s sentence on the original charge with the same tainted evidence. Id. at 612; McCrory, 930 F.2d at 71 (Silberman, J., concurring in part and concurring in the judgment).
However, while in Verdugo we endeavored to sharpen the horns of the dilemma that the exclusionary rule presents police in their pursuit of incriminating evidence, we have also been mindful of the requirement that the exclusionary rule be tailored contextually such that the cost of probative evidence lost not exceed the deterrent value gained. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1042-50, 104 S.Ct. 3479, 3485, 82 L.Ed.2d 778 (1984) (applying cost-benefit analysis to reject extension of the exclusionary rule to civil deportation hearings). Limiting Verdugo’s reach to circumstances where law enforcement officers commit a blatant illegality in pursuit of evidence compounding an already well-substantiated charge, we have found that “the potential benefit from extension of the exclusionary rule is slight” where higher or less readily deterred motivations actuated the illegal search. Vandemark, 522 F.2d at 1022.
In Vandemark we permitted consideration of evidence derived from an allegedly illegal stop at the defendant’s probation hearing and distinguished Verdugo on the ground, inter alia, that the searchers in Verdugo were piling on, as it were, as opposed to seeking additional evidence to vouchsafe the defendant’s conviction on a prior, tenuously corroborated charge. Vandemark, 522 F.2d at 1023-24. With the advent of the Guidelines, other circuits have suggested a similar approach whereby illegally seized evidence would be suppressed at sentencing if law enforcement authorities seized it for the express purpose of enhancing the sentence of a suspect already under indictment or investigation. See United States v. Arango, 966 F.2d 64, 67 (2d Cir.1992); McCrory, 930 F.2d at 68-69; see also, United States v. Jewel, 947 F.2d 224, 236, n. 18 (7th Cir.1991).
We are not persuaded that the DEA acted, or objectively viewed, had an undue incentive to act, in a manner jeopardizing Kim’s Fourth Amendment rights in order to enhance a charge for which they already had sufficient evidence to support a conviction.[9] To be sure, as in Verdugo, before embarking on a warrantless quest for additional contraband, the agents in the instant case already had enough evidence to support the single charge of which the defendant was later convicted. See Verdugo, 402 F.2d at 610, n. 21. Notwithstanding the search and seizure issues raised by Kim in this appeal, viewing the evidence against Kim prospectively and from the DEA’s perspective, no patent infirmities undermined the pre-existing charge for possession of the 94 grams of ice found on Kim during his initial encounter with the DEA on November 13, 1991. As such, without further factual inquiry, a substantial indicator of an enhancement motive for the search would appear to be present.
Nonetheless, because the marginal deterrent value of applying the exclusionary rule to sentencing in these circumstances would be slight, the predicate is missing for the exception set forth in Verdugo to the rule against application of the exclusionary rule at sentencing. See Vandemark, 522 F.2d at 1022-25. Given the compelling interest of *1436 the DEA in apprehending Kim and seizing a fleeting opportunity to inderdict a potentially substantial shipment of narcotics, a contrary ruling would create little additional disincentive to illegal Government forays motivated by a desire to obtain by hook or by crook evidence enhancing a prior charge. See Lopez-Mendoza, 468 U.S. at 1044-45, 104 S.Ct. at 3486-87.
As the district court correctly ruled, the DEA’s illegal search of Kim’s hotel room was conducted under circumstances insufficiently exigent to excuse the lack of a warrant. However, these circumstances were sufficiently pressing to warrant the district court’s conclusion that the DEA’s discovery of additional quantities of methamphetamine in Kim’s room was “more by chance than by design.” That is, these circumstances suggest as an alternative to the objective of compounding Kim’s sentence an overriding motive on the part of the DEA, bom perhaps of an overzealous sense of duty heeded at the expense of any semblance of constitutional punctilio, to inderdict imminent drug trafficking within their jurisdiction.
When Kim’s brother disclosed the approximate time of the narcotics shipment which Kim was to orchestrate that day, only as little as five to six hours remained for the DEA to act. As evidenced by the DEA’s willingness to negotiate the deal that set Kim free and their unbridled acts upon learning that Kim had reneged as to the transaction at the hotel room, the DEA was keenly interested in interdicting more substantial.narcotics shipments through their jurisdiction of the sort that transaction promised to be. Whereas the defendant in Verdugo was by many appearances a neighborhood dealer operating out of a comparatively fixed location, his home, 402 F.2d at 608-09, Kim was a purchaser whose presence in a transitory setting offered a relatively narrow window of opportunity to seize the contraband and obtain evidence against a mainland dealer potentially situated higher up an interstate chain of distribution.
Similarly, and in additional contrast to Ver-dugo, the DEA’s illegal search and seizure of Kim was quite plausibly motivated by a desire to apprehend Kim outstripping any incentive to compound the evidence against him. Following the several weeks in which Kim remained at large but incommunicado, his failure to inform the DEA of the transaction in question could reasonably be construed to signify Kim’s disavowal of his promise to serve as a DEA informant. Together with his attempt, thwarted by Honolulu police, to fly overseas on a one way ticket, this conduct would have justified the DEA in believing that Kim intended to avoid his end of the bargain with, as well as capture by, the DEA. No such evasive suspect or ephemeral enforcement opportunity confronted the police in Verdugo so as to prompt immediate,'warrantless interdiction or present capture as a compelling alternative to enhancement of a prior charge as the motivation for their violation of the Fourth Amendment.
Viewed in this light, the district court’s consideration of the illegally seized contraband at sentencing comports with Verdugo and the tests enunciated in Vandemark and McCrory insofar as the searching agents had as their object the preservation, as opposed to enhancement, of a prior charge against the subject of the search. Vandemark, 522 F.2d at 1022-25; McCrory, 930 F.2d at 69. Unless the DEA could take the elusive, non-compliant Kim back into custody, the prior charge outstanding against Kim was in jeopardy, albeit for lack of a defendant rather than incriminating evidence. Arrayed against these alternative motivations for the illegal search is Kim’s claim that the DEA agents set out to his hotel room intending to extend his incarceration for the prior offenses outside the herb center. Finding no clear error in the district court’s contrary factual finding, we AFFIRM.

. Instructively, other circuits in factually similar cases have consistently held that an officer’s approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure. See, e.g., United States v. Encarnacion-Galvez, 964 F.2d 402, 410 (5th Cir.), cert. denied, - U.S. -, 113 S.Ct. 391, 121 L.Ed.2d 299 (1992); United States v. Castellanos, 731 F.2d 979, 983-84 (D.C.Cir.1984); United States v. Pajari, 715 F.2d 1378, 1381-83 (8th Cir.1983). See also, Lafave, 3 Search and Seizure § 9.2(h), 408-09 (2d ed. 1987) (concluding that "if an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure”) (footnotes omitted).
As in the instant case, in Pajari the plainclothes DEA agents had not summoned the suspect or drawn their weapons and they framed their attempt to obtain identification and information from the suspect as a request. 715 F.2d at 1380-81. In further parallel to the instant case there was no indication in Pajari that the officers activated their unmarked patrol car's lights or siren. Like the interrogating officer in Pajari and Encarnacion-Galvez, 964 F.2d at 405, Agent Aiu was not uniformed or visibly armed, and would therefore have been equally unlikely in this respect to emanate to any unduly intimidating extent the authority to detain the suspect, with or without his consent.

. Even if Agent Aiu had more completely blocked the departure of Kim's automobile, Kim enjoyed greater latitude during his initial conversations with Agent Aiu to depart, even if on foot, than that enjoyed by the more closely hemmed-in suspect whom, approached from two sides with his back against a pillar inside an airport terminal, we deemed not to have been stopped in $25,000 U.S. Currency. 853 F.2d at 1504-05; see also, Encarnacion-Galvez, 964 F.2d at 410. While the sensed or manifest presence of additional officers would certainly contribute to the reasonableness of an individual’s conclusion that he was not free to leave, this factor is not dispositive if an avenue for departure remains open. See $25,000 U.S. Currency. 853 F.2d at 1504-05.

. The Delgado Court obviated inquiry into the existence of individualized, reasonable suspicion or probable cause during a factory sweep by the Immigration and Naturalization Service (INS) by concluding that the INS agents' questioning of employees regarding alienage constituted extra-constitutional "classic consensual encounters rather than Fourth Amendment seizures.” Delgado, 466 U.S. at 221, 104 S.Ct. at 1765. In the instant case, Kim was similarly questioned by a single plainclothes agent partially but not completely blocking his egress, with his weapon kept out of sight and back-up posted in the background. Notwithstanding the "studied air of unreality” the Delgado dissent discerned in the majority opinion, this issue may thus be informed by the Delgado Court's determination that agents who literally stopped the more active progress of exiting employees, as opposed to a seated suspect, had not technically conducted an investigatory stop. Id.; see also, $25,000 U.S. Currency, 853 F.2d at 1504-05.
Besides, although racial appearance alone is an insufficient basis for an investigatory stop, Brignoni-Ponce, 422 U.S. at 885-86, 95 S.Ct. at 2582-83, it is a relevant factor on which an agent may rely in the context of other circumstantial elements, such as Kim's estimated height, age and location, establishing parallelism between a detained and a previously described suspect. United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); see also, Johnson, Race and the Decision to Detain a Suspect, 93 Yale L.J. 214, 239 (1983).

. In addition, in our inquiry into voluntariness we note that a plausible explanation exists for why the defendant ostensibly acted contrary to his self-interest. As demonstrated by his immediately subsequent, pre-arrest offer of cooperation, Kim, like the defendant in Mendenhall, may have concluded from the outset that consensual compliance was a sound strategy rather than the only alternative to a vain act of defiance; that is, he conceivably concluded that by handing over the contraband without protest, he "was acting in [his] self-interest, by voluntarily cooperating with the officers in the hope of receiving more lenient treatment.” Mendenhall, 446 U.S. at 559, n. 7, 100 S.Ct. at 1880, n. 7.

. Kim challenges admission of these additional amounts of methamphetamine not on the ground that they lie outside the parameters of relevant conduct, but on the analytically distinct basis that they fell within the ambit of the exclusionary rule. We therefore need not review the district court's conclusion that Kim’s crimes in his two encounters with the DEA were sufficiently similar, regular and temporally proximate to constitute relevant conduct and thus permit grouping of separately seized contraband under the three-pronged test we enunciated in United States v. Hahn, 960 F.2d 903, 910 (9th Cir.1992).

. U.S.S.Q. § 1B1.4 provides that "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law" (emphasis added).

. Kim mistakenly concludes that because U.S.S.G. § 1B1.3 is silent as to whether other provisions in the Guidelines or applicable law restricts the sentencing judge's discretion in setting the guideline range, the judge does not have "license” to raise the guideline range on account of additional contraband suppressed at trial. This contention is inaccurate insofar as it presumes an inversion of the statutory hierarchy governing, if not an unnecessary conflict between, Section 3661 and the Guidelines. See United States v. Boshell, 952 F.2d 1101, 1106 (9th Cir. 1991) (interpreting the Guidelines narrowly to avoid conflict with Section 3661); United States v. Mondello, 927 F.2d 1463, 1469 (9th Cir.1991). Section 3661 more clearly authorizes the sentencing judge to take all considerations into account, except where, as in U.S.S.G. § IB 1.4, the Guidelines limit this discretion.

. Obliquely calling into question whether Verdu-go's remains good law, Judge Silberman concluded in McCrory that "[s]ince the Supreme Court currently views the [exclusionary] rule to be a remedial device rather than a constitutional right of a defendant.” Section 3661 precludes application of the rule to sentencing under the Guidelines. 930 F.2d at 72 (Silberman, J., concurring), citing Calandra, 414 U.S. at 348, 94 S.Ct. at 620. We do not adopt this conclusion categorically. However, although 18 U.S.C. § 3577 (1948), the identically worded predecessor of Section 3661 then in force, predated Ver-dugo by three decades without altering its analysis, we recognize that Calandra later eroded the constitutional ground on which we could base our authority even implicitly to carve out an exception to Section 3661's reasonably unambiguous Congressional mandate. That is, the continued vitality of our holding in Verdugo is uncertain insofar as it was founded on the contemporary but currently disfavored notion that "the exclusionary rule ... is a part of the constitutional right, not merely a rule of evidence.” Verdugo, 402 F.2d at 610. As we recognized from the outset in Verdugo, given that “[t]he precise basis for the doctrine is [not] clear ... the ground which ultimately prevails may, in some circumstances, affect the propriety of use of illegally seized evidence in sentencing.” Id. at 611.
On the other hand, in subsequent cases we have narrowed and revamped Verdugo to harmonize the case more closely with the prevailing view that the exclusionary rule is a judicially created remedial device whose contours are delimited by means of a utilitarian calculus of deterrence versus lost probative evidence. See, e.g., United States v. Vandemark, 522 F.2d 1019, 1022 (9th Cir.1975). Because this nettlesome issue is not dispositive and was not briefed by the parties, we decline to decide whether the Guidelines and Section 3661 foreclose the application of Verdugo’s judicially-crafted remedial device to sentencing and, like the majority in McCrory, "leave open the question whether suppression would be necessary and proper at the sentencing phase where it is shown that the police acted egregiously, e.g., by undertaking a warrantless search for the very purpose of obtaining evidence to increase a defendant's sentence.” McCrory, 930 F.2d at 69, citing Verdugo, 402 F.2d at 611-613.

. We recognize the difficulties inherent in the subjective inquiry into the motivations of law enforcement authorities necessitated by tests these circuits have propounded for applying the exclusionary rule to sentencing determinations. See Jewell, 947 F.2d at 238-40 (Easterbrook, J., concurring); United States v. Gilmer, 811 F.Supp. 578, 585 (D.Col.1993). However, the correctness of the sentencing judge’s admission of the additional 348 grams of methamphetamine would not vary depending on the objective or subjective nature of the test adopted. Admission of the additional, illegally seized contraband would be proper under either the subjective tests other circuits have formulated or an alternative, objective inquiry of the sort we adopted in Verdugo, 402 F.2d at 612, into the extent to which law enforcement officials had an unacceptably high incentive to violate the Fourth Amendment in their pursuit of incriminating evidence. See McCrory, 930 F.2d at 71 (Silberman, J., concurring in part and concurring in the judgment).