73 F.3d 371
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mariano CAUDILLO-ALVARADO, Defendant-Appellant.
 No. 94-50509.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 11, 1995.
Decided Dec. 27, 1995.
 
 Before: BROWNING, NORRIS and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 On August 4, 1993, Mariano Caudillo-Alvarado was arrested at his residence and taken into custody. He had no prior criminal record. After being charged in a three-count superseding indictment, Caudillo filed a motion to suppress evidence. The district court denied his motion and the jury convicted him on all counts. He was sentenced to a term of imprisonment of 15 years.[1]
 
 
 3
 Caudillo argues that the evidence presented at trial was insufficient to convict him of any of the charges alleged in the indictment. We review insufficient evidence claims by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Vgeri, 51 F.3d 876, 879 (9th Cir.1995). We hold that there was sufficient evidence to convict Caudillo under Counts I and II for aiding and abetting the possession of methamphetamine with the intent to distribute and aiding and abetting the manufacture of methamphetamine because the facts presented at trial were sufficient for a rational juror to infer that Caudillo not only participated in, but intentionally assisted in the drug manufacturing venture's illegal purposes. United States v. Disla, 805 F.2d 1340, 1352 (9th Cir.1986). Likewise, we hold that there was sufficient evidence to convict Caudillo under Count III of possessing a firearm in relation to a drug offense.
 
 
 4
 Caudillo also argues that the district court erroneously admitted drug profile evidence, that law enforcement officers entered his property illegally, and that district court erred in calculating his sentence. We do not reach these issues because we conclude that Caudillo did not voluntarily consent to the warrantless search of his residence.
 
 
 5
 The principal evidence presented at trial against Caudillo was the fruit of a warrantless search begun shortly before 1:00 a.m. on August 4, 1993 and conducted intermittently until around 3:00 p.m. the following afternoon. Relying on a phone call to the Sheriff's Department reporting that men were wearing chemical masks around Caudillo's ranch house, two sheriff's deputies, Deputy John Hamm and Deputy Ron McClanahan, went to investigate. Deputy Hamm drove to the outskirts of the ranch where he met Deputy McClanahan. They parked their patrol cars, walked down the road connecting the ranch property to the highway, and jumped a five-foot fence locked by a gate on which a "No Trespassing" sign was posted. When the officers were 20 to 30 yards from the house, Caudillo met them. This encounter took place around 1:00 a.m. The officers were in uniform and had their guns drawn.[2] According to one of the officers, he and Caudillo had a conversation in English during which he asked Caudillo what was going on; Caudillo replied that he and some friends were having a few beers; the officer then asked Caudillo if they could look at his house; Caudillo replied affirmatively.
 
 
 6
 Caudillo and the two officers walked to the house. Deputy Hamm went inside with Caudillo while Deputy McClanahan waited at the door, either inside the door or just outside the doorway. Caudillo and Hamm remained in the house for about a minute during which time Hamm observed a white powdery substance on a window sill. While Hamm walked with Caudillo, McClanahan, using his flashlight, looked through the windows of a utility room adjacent to the house and saw what he believed to be a methamphetamine lab.[3] Caudillo was handcuffed, arrested, searched, handcuffed to a pole adjacent to his residence for some period of time and then placed, in handcuffs, in one of the patrol cars. More extensive searches of the house were conducted several hours later, after agents from the Narcotics Task Force had arrived and obtained Caudillo's signature on a written consent form.
 
 
 7
 In denying Caudillo's motion to suppress, the district court concluded that during the initial encounter Caudillo gave the sheriff's deputies "permission to look in the house". It is unclear from the district court's findings whether the judge concluded that Caudillo's consent could be inferred from his walking towards the house with the officers or whether she concluded that Caudillo had responded affirmatively to a verbal request for permission to look in his house.[4] With respect to Caudillo's subsequent execution of the written form, although the district judge acknowledged that it was "unclear whether the defendant could understand the ... written consent form," she concluded, on the basis of the agents' English-language explanation of the form, that Caudillo's consent was voluntary.
 
 
 8
 "Without a warrant, a search and seizure by the government is per se unreasonable under the fourth amendment unless the circumstances fall within the parameters of a specifically established exception." United States v. Howard, 828 F.2d 552, 554 (9th Cir.1987). In this case, the government relies on the voluntary consent exception.
 
 
 9
 We review a district court's finding that an individual voluntarily consented to a search under the clearly erroneous standard. United States v. Spires, 3 F.3d 1234, 1236-37 (9th Cir.1993).
 
 
 10
 We base our decision regarding the voluntariness of consent on the "totality of circumstances surrounding the giving of consent." United States v. Kim, 25 F.3d 1426, 1432 (9th Cir.1994), cert. denied, 115 S.Ct. 607 (1994). Here, the totality of circumstances surrounding Caudillo's initial "consent" demonstrates that it was not voluntary.
 
 
 11
 Caudillo, who ordinarily speaks Spanish and has some difficulty comprehending English,[5] met two uniformed police officers coming toward him on his property in a remote area in the middle of the night. The two officers were armed with guns and flashlights. The guns were drawn and the flashlights were shining on Caudillo. Under these circumstances, barring sufficient countervailing indicia of voluntariness, any consent given by Caudillo constitutes "[m]ere acquiescence to lawful authority." Such acquiescence is clearly an insufficient basis for finding consent to be voluntary. Spires, 3 F.3d at 1237.
 
 
 12
 "[F]ree and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir.1990).
 
 
 13
 [The government] must show that there was no duress or coercion, express or implied. The consent must be "unequivocal and specific" and "freely and intelligently given." There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. " 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show there was no coercion in fact.
 
 
 14
 Id. (citing United States v. Page, 302 F.2d 81, 83-84 (9th Cir.1962).
 
 
 15
 In the instant case, the government did not make the requisite showing. That officers have their guns drawn at the time they request consent and that the person giving consent is not told that he has the right to withhold that consent is forceful probative evidence that the consent was not voluntary. United States v. Welch, 4 F.3d 761, 763 (9th Cir.1993). We consider all of the circumstances surrounding the giving of including: whether the defendant was in custody, whether Miranda warnings were given prior to the search, and whether the officers told the defendant that they could obtain a search warrant. Id. The defendant's custody status and the giving of a Miranda warning are only implicated, however, when the defendant has been arrested or is otherwise in custody. Kim, 25 F.3d at 1432.
 
 
 16
 Here, we view the facts that the officers' guns were drawn and Caudillo was not told that he had the right not to consent in the context of the time of night, the isolation of the dirt road, the officers' being in uniform and holding flashlights, and the defendant's language difficulties. These circumstances, which collectively create a highly coercive atmosphere, are not outweighed by the fact that Caudillo was not placed under arrest or told that the officers could obtain a search warrant. In this case, it is clear that the consent was obtained under color of the badge. See United States v. Perez, 644 F.2d 1299, 1303 (9th Cir.1981) (reversing finding of voluntariness where agents approached the defendants "with weapons drawn"); United States v. Marshall, 488 F.2d 1169, 1189 (9th Cir.1973) (reversing finding of voluntariness where consent was effectuated by agents "with drawn guns"). Cf. United States v. Morning, 64 F.3d 531, 533 (9th Cir.1995) (upholding finding of voluntariness where "officers did not unholster their guns"); United States v. Kim, 25 F.3d 1426, 1432 (9th Cir.), cert. denied, 115 S.Ct. 607 (1994) (upholding finding of voluntariness after emphasizing the fact that the officers were in "plain-clothes" with "guns holstered and concealed"); United States v. Kelley, 953 F.2d 562, 566 (9th Cir.1992) (upholding finding of voluntariness after noting that the officer to whom consent was given "re-holstered his gun" before consent was given); United States v. Childs, 944 F.2d 491, 496 (9th Cir.1991) (upholding finding of voluntariness having noted that the record did not show that the officer's gun was out of the holster at the time consent was given); United States v. Alfonso, 759 F.2d 728, 732, 741 (9th Cir.1985) (upholding finding of voluntariness where officers holstered their guns before asking for consent to search).
 
 
 17
 The government cites no cases in which we have upheld a finding of voluntariness when the officers obtained a defendant's consent while their weapons were drawn. When two uniformed officers, guns drawn and flashlights shining, confront a defendant with limited proficiency in English on a remote dirt road in the middle of the night, obviously having surmounted a five-foot fence surrounding his ranch, we hold that a finding of voluntariness is clearly erroneous.[6] Cf. LaDuke v. Nelson, 762 F.2d 1318, 1329 (9th Cir.1985) (upholding a finding of involuntariness where agents uniformly failed to advise occupants of their right to refuse, where those being searched had "limited lingual and educational background[s]," and where the searches took place in "early morning or late evening hours").
 
 
 18
 We have no difficulty, moreover, in concluding that the trial judge clearly erred when she found that Caudillo's written consent was voluntary. Although there is no indication that the narcotics agent had his gun drawn when he obtained Caudillo's signature on the written consent form, other evidence of the type that we frequently consider in "voluntariness of consent" cases compels that conclusion. Caudillo's English proficiency was limited, and he found himself handcuffed and confronted by two narcotics agents in a sheriff's patrol car at a very late hour. By the time he was asked for his written consent, he had been placed under arrest. See Kim, 25 F.3d at 1432 (noting the importance of the defendant's custody status to the voluntariness determination). In addition, he had already consented involuntarily to a search of the same property and the law enforcement officials had already entered his premises, looked around, and observed incriminating evidence. In light of all of the evidence, the district court's finding of voluntariness as to the written consent was also clearly erroneous.[7]
 
 
 19
 The government clearly failed in its effort to show an absence of coercion and, thus, clearly failed to establish that Caudillo voluntarily consented to the search of his residence, either orally or in writing. The district court's findings to the contrary were clearly erroneous. Accordingly, the intermittent search of Caudillo's residence and the area directly surrounding it was conducted in violation of the Fourth Amendment.[8] The evidence seized is a fruit of the unlawful search and therefore inadmissible. Caudillo's convictions are reversed and remanded for further proceedings consistent with this disposition.
 
 
 20
 REVERSED AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Caudillo was convicted of 1) aiding and abetting possession of methamphetamine with intent to distribute in violation of 21 U.S.C. Sec. 841 and 18 U.S.C. Sec. 2; 2) aiding and abetting the manufacture of methamphetamine in violation of 21 U.S.C. Sec. 841 and 18 U.S.C. Sec. 2; and 3) using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. Sec. 924(c)
 
 
 [2]
 Deputy McClanahan testified that he had his gun drawn and that he believed Deputy Hamm did as well. The government's brief inadvertently mischaracterizes Caudillo's trial testimony when it says Caudillo testified that he saw no guns drawn. To the contrary, Caudillo testified that he "saw they had a gun in their hands" after "they put the flashlight on [him]."
 
 
 [3]
 At the suppression hearing, Deputy Hamm testified that as the officers approached the house, they saw a large gas cylinder and several vehicles parked alongside the house. He further testified that they saw chemical masks, gloves, and a white powdery substance on some of the vehicles
 
 
 [4]
 The district court's conclusion as to whether Caudillo consented to the officers' search follows:
 And ultimately, what the officers actually heard, the fence rattling, saw what they believed to be men running from the area, only after that occurred did they ask Mr. Caudillo for permission to look in the house--and there's no dispute that it appears that Mr. Caudillo was giving them permission to look in the house--walked towards the house with them.
 The only testimony during the suppression hearing as to whether Caudillo voluntarily consented to the search of his house was proffered by Deputy Hamm who said: "I asked him if we could go look at his house, you know, go look in his house, and he said okay." The other officer present, Deputy McClanahan, did not hear the discussion.
 
 
 [5]
 Caudillo's attorney proffered that one of his neighbors would testify to his limited ability to understand English:
 that whenever [the neighbor] had conversations with Mr. Caudillo, she would often have to use his children to translate for him.... And he had a very difficult time understanding what she was trying to tell him in English, and that she often had to rely on these children to translate or to interpret for her and that he is not proficient in English at all.
 Moreover, the district court, although finding that Caudillo could comprehend English and understood what the officers said to him, made the following observations:
 I can see that Mr. Caudillo speaks Spanish, that he's using a Spanish-speaking interpreter, he's used an interpreter on many occasions when he's discussed this case with Counsel and with the Assistant United States Attorney.
 
 
 [6]
 That Caudillo had spoken with Deputy Hamm on one prior occasion does not change the fact that suddenly confronting him again in the middle of the night under the circumstances described in the text would be intimidating. Likewise, that Caudillo had been able to communicate with the deputy when he voluntarily contacted the officer on that earlier date does not mean that his difficulty with the English language is not relevant to our determination of the voluntariness of his consent during the post-midnight armed encounter
 
 
 [7]
 Even if Caudillo had otherwise voluntarily given his written consent, the prior illegal entry of his home and illegal search of his premises might have tainted his subsequent consent to search sufficiently to require the exclusion of any seized evidence. United States v. Howard, 828 F.2d 552, 556 (9th Cir.1987); United States v. Taheri, 648 F.2d 598, 601 (9th Cir.1981)
 
 
 [8]
 We need not decide whether the fence surrounding Caudillo's home was outside the curtilage of his residence. Not having obtained a valid consent before entering either the curtilage or the home itself, the deputies' warrantless search was illegal and tainted all the evidence they found within the residence and its curtilage