IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1853
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

ROBERTO ENCARNACION-GALVEZ,

Defendant-Appellant

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

(June 17, 1992)

Before KING and WIENER, Circuit Judges and LAKE,[*] District Judge.

SIM LAKE, District Judge:

Defendant-Appellant, Roberto Encarnacion-Galvez, appeals his conviction for illegal reentry into the United States following deportation in violation of 8 U.S.C. § 1326. Encarnacion-Galvez argues that the district court erred in denying his motions to dismiss the indictment and to suppress evidence. We **AFFIRM**.

## Facts and Procedural History

Encarnacion-Galvez is a citizen of Mexico. He unlawfully entered the United States in May of 1983. In 1987 he was convicted

_____

[*] **District Judge for the Southern District of Texas, sitting by designation.**

of aggravated robbery in a Texas state court and received a ten-year sentence. While Encarnacion-Galvez was in state prison the United States Immigration and Naturalization Service initiated deportation proceedings against him under 8 U.S.C. § 1251(a). This statute provided a number of alternative grounds for deporting an alien. Among those grounds were entry into the United States without inspection and commission of a crime of moral turpitude within five years after entry into the United States for which a sentence of confinement of a year or more is imposed.[1] At the hearing before the district court on his motion to dismiss the indictment Encarnacion-Galvez gave the following answers to questions about a meeting he had with his attorney after an immigration judge ordered him to show cause why he should not be deported:

Q. And what, to your recollection, did you discuss with her about your immigration status?

A. She told me that I will be deported, but I need to appear before a judge.

Q. And what did she advise you in respect to appearing before the judge?

A. She told me that I had a chance to stay here in Texas or to be sent back to Mexico.

Q. What did she tell you would happen if you chose to fight the case and try to stay in the United States?

---

[1] At the time of Encarnacion-Galvez's deportation these provisions were found in 8 U.S.C. § 1251(a)(2) and (4). They have since been recodified and are now found in 8 U.S.C. § 1251(a)(1)(B) and (2)(A)(i).

\91-1853.Op

A. She told me that my chances wasn't very big because I was with aggravated crime committed, but she told me that I have some chances for the long period of time that I have been here in the United States.

Q. Was your decision to fight the immigration case, Mr. Encarnacion?

A. No.

Q. Why did you choose not to fight the case?

A. Because she told me that, if I wanted to fight it, I needed to be in jail for six months, for a period between six months to a year.

Q. What did you choose to do, instead, Mr. Encarnacion?

A. According to what she told me and explained to me is that I was able to go back to Mexico, if I would sign a voluntary departure.

Q. Did you, in fact, sign a document waiving your right to a hearing?

A. Yes.[2]

Encarnacion-Galvez identified for the district court a Spanish language instrument entitled "Statements Given For The Final Deportation Order To Be Issued" that he and his attorney signed on March 17, 1988. Encarnacion-Galvez testified that he discussed the "Statements" with his attorney and read the instrument before signing it, although he did not read Spanish well.[3] In the "Statements" Encarnacion-Galvez acknowledged, among other things:

(1) I have been given the Order to Show Cause on 3-1-88, and my true, correct and complete name is as stated in that document.

---

[2] Record Vol. 2 at pp. 8 and 9.

[3] Record Vol. 2 at pp. 10 and 12-14.

-3-

(2)  I have consulted with the attorney mentioned below, and I hereby give up my right to have a hearing before an immigration judge.

(3)  My lawyer has fully explained my rights to me.  I understand my rights, and I waive further explanation of my rights by the court.

(4)  I hereby admit all the allegations of fact contained in the Order to Show Cause as true and correct as written.

(5)  I hereby agree that I am subject to be deported from the United States in accordance with the charges in the Order to Show Cause.

. . .

(7)  I am requesting the issuance of an order for my deportation to <u>Mexico</u>.

. . .

(9)  I will accept a written order of deportation to the country I designate as the final disposition of this deportation process.[4]

The March 1, 1988, Order to Show Cause referred to in the "Statements" alleged that Encarnacion-Galvez was a citizen of Mexico, that he entered the United States illegally in May of 1983, that he was convicted of aggravated robbery on September 1, 1987, for which he was sentenced to ten years' confinement in the Texas Department of Corrections, and that he was deportable under §§ 241(a)(2) and (4) of the Immigration and Nationality Act[5] because he had entered the United States illegally and, after

---

[4] Although the only version of the "Statements" in the record is in Spanish (Defendant's Ex. No. 1), Encarnacion-Galvez does not dispute the English translations of these portions of the "Statements."

[5] Formerly 8 U.S.C. § 1251(a)(2) and (4).

-4-

entry, had been convicted of a crime of moral turpitude for which he was sentenced to confinement of a year or more.

On April 29, 1988, the immigration judge signed a Decision and Order deporting Encarnacion-Galvez to Mexico.[6] In the Decision and Order the immigration judge acknowledged Encarnacion-Galvez's "Statements" waiving a hearing, admitting the charges in the Order to Show Cause, and conceding his deportability. The judge concluded that there were no factual or legal disputes to be resolved, and that "as a result of respondent's admitted criminal record in the United States, there [is] no relief from deportation apparently available to him or discretionary considerations to be exercised by the [judge] . . . ." Encarnacion-Galvez did not appeal the order of deportation or pursue further administrative remedies.[7]

Encarnacion-Galvez was deported on September 5, 1990. He did not receive consent from the Attorney General to apply for readmission to the United States after his deportation. On March 1, 1991, United States Border Patrol agents Torrez and Guerrero, patrolling in an unmarked vehicle, observed Encarnacion-Galvez driving a vehicle in Mineral Wells, Texas. Agents Torrez and Guerrero were suspicious that Encarnacion-Galvez and a passenger, Ramirez, were

---

[6] Record Vol. 1 at p. 50.

[7] Record Vol. 1 at p. 50. An alien who is dissatisfied with the order of an immigration judge may appeal to the Board of Immigration Appeals and from there to a United States Court of Appeals.

-5-

illegal aliens because of their physical appearance and manner of dress, and the agents followed the vehicle driven by Encarnacion-Galvez into a parking lot. The vehicle driven by Encarnacion-Galvez stopped and parked before the agents' vehicle reached the lot. After parking in a manner that did not prevent Encarnacion-Galvez from driving or walking out of the lot, the agents approached Encarnacion-Galvez's vehicle on foot. Both agents were dressed in plain clothes and were armed, but their weapons were not visible to Encarnacion-Galvez or Ramirez. Speaking through the automobile window, the agents identified themselves as Border Patrol agents and inquired about Ramirez's citizenship status. After Ramirez stated that he was a resident alien, agent Torrez asked him to produce his resident alien card. Ramirez responded that his resident alien card was at his home in Weatherford, Texas. At Torrez's request Ramirez then got out of the car so that a computer check could be run on his citizenship status.

While agent Guerrero continued talking with Ramirez, agent Torrez questioned Encarnacion-Galvez, who had remained in the car, through the passenger-side window. Encarnacion-Galvez stated that he also was a resident alien and produced a Texas driver's license issued in his name. When asked to produce his resident alien card, Encarnacion-Galvez also said that he had left it at his home in Weatherford. Encarnacion-Galvez agreed to a computer check on his citizenship status. The computer checks conducted by agent Torrez did not reflect that Encarnacion-Galvez and Ramirez were registered

as resident aliens.  Encarnacion-Galvez and Ramirez then agreed to accompany the agents to Weatherford to produce their resident alien cards.  While riding in the agents' vehicle, Encarnacion-Galvez recanted and admitted that he was not a resident alien.[8]

On March 28, 1991, Encarnacion-Galvez was indicted for illegal reentry after deportation in violation of 8 U.S.C. § 1326.  He moved to dismiss the indictment and to suppress his driver's license and his statements to the Border Patrol agents.  The district court held an evidentiary hearing on both motions.

The testimony raised three factual disputes concerning Encarnacion-Galvez's deportation.  First, contrary to the language of the "Statements," Encarnacion-Galvez testified that he believed that by signing the "Statements" he was agreeing to voluntary departure, not deportation.  Second, Encarnacion-Galvez testified that he did not understand that by signing the "Statements" he would never appear before a judge.[9]  This testimony contradicted admission (2) of the "Statements" and the testimony of Encarnacion-Galvez that he signed the "Statements" only after his lawyer told him that if he chose "not to fight the case" and to sign the waiver of his right to a hearing, he would not need to appear before an immigration judge.[10]  Finally, Encarnacion-Galvez argued that he did not knowingly waive his right to a hearing and to deportation

---

[8] Record Vol. 2 at pp. 17-36.

[9] Record Vol. 2 at pp. 10 and 11.

[10] Record Vol. 2 at pp. 8 and 9, quoted supra.

-7-

because at the time that he signed the "Statements," he did not read Spanish well, did not speak English at all, and had relied upon another inmate to translate the discussions with his lawyer.

The district court resolved these fact issues against Encarnacion-Galvez. The court found that "the defendant obviously knew what he was doing when he signed the ["Statements"] and knowingly and willingly consented to the procedure that was followed that resulted in his deportation. And I am persuaded that he knew he was being deported, rather than having some other kind of proceeding."[11] The court also denied Encarnacion-Galvez's motion to suppress, holding that the contact between the Border Patrol agents and Encarnacion-Galvez was not a seizure requiring reasonable suspicion, but only a casual contact. Alternatively, the court concluded that if the contact was a stop that required reasonable suspicion, the agents' experience and knowledge of the traits of illegal aliens met that requirement.[12] Encarnacion-Galvez then entered a conditional plea of guilty preserving his right to appeal the district court's denial of his motions.

### The Motion to Dismiss the Indictment

Encarnacion-Galvez argues that the deportation proceeding was fundamentally unfair because his waiver of a hearing before an immigration judge and consent to deportation were neither knowing

---

[11] Record Vol. 2 at p. 15.

[12] Record Vol. 2 at p. 39.

-8-

nor the result of his considered judgment. Because the deportation order was obtained in violation of his due process rights, he argues that the government cannot rely on it as an element of proof to support his conviction under 8 U.S.C. § 1326. The government responds that the deportation proceeding was not fundamentally unfair because Encarnacion-Galvez failed to show either that his waiver of a hearing and agreement to deportation were unknowing and unintelligent, or that he suffered any prejudice from the alleged unfairness of the deportation proceeding. We begin our analysis of these arguments by briefly summarizing precedent in the area.

In <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828, 107 S.Ct. 2148 (1987), the Court held that an alien charged with illegal reentry after deportation may collaterally challenge the validity of his deportation in a subsequent criminal prosecution if the deportation proceeding effectively eliminated the alien's right to obtain judicial review of his deportation. Because the government conceded that the deportation order at issue in <u>Mendoza-Lopez</u> was fundamentally unfair, that Court had only to decide whether a collateral challenge was permissible. The Court had no need to decide what a defendant must show to prevail in such a collateral challenge.[13] The issue before this court is the converse of that before the Court in <u>Mendoza-Lopez</u>. The government concedes that

---

[13] The United States did not seek review of the Eighth Circuit's holding that the deportation proceeding was fundamentally unfair and the deportation order therefore unlawful. <u>Mendoza-Lopez</u>, 481 U.S. at 834, n.8, 107 S.Ct. at 2153, n.8.

-9-

Encarnacion-Galvez can collaterally attack his deportation, but argues that he cannot prevail on his collateral attack because his deportation proceeding was not fundamentally unfair.

Mendoza-Lopez presupposes a two-step process for determining when an alien can prevent his deportation from being used as a basis for conviction under 8 U.S.C. § 1326. First, the alien must show that the deportation hearing was fundamentally unfair. Second, he must show that the defective deportation hearing effectively eliminated his right to direct judicial review of the deportation order. United States v. Palacios-Martinez, 845 F.2d 89, 91 (5th Cir.), cert. denied, 488 U.S. 844, 109 S.Ct. 119 (1988). To successfully challenge a prior order of deportation an alien must satisfy both elements. Should he fail to prove either element, a court need not consider the other. Palacios-Martinez, 845 at 92; United States v. Saucedo-Velasquez, 843 F.2d 832, 836, n.6 (5th Cir. 1988).

In Palacios-Martinez the defendant challenged a deportation order issued following a hearing at which he and a group of other aliens appeared. The immigration judge advised them as a group of their rights and asked them if they understood their rights and wished to waive them. All of the aliens consented to deportation. Palacios-Martinez later reentered the United States and was charged with illegal reentry under 8 U.S.C. § 1326. In a motion to dismiss his indictment, Palacios-Martinez collaterally challenged his deportation as being fundamentally unfair because he was not

-10-

individually advised of the rights he waived by consenting to deportation. Alternatively, he argued that the waiver was not a considered and intelligent decision. The court affirmed the district court's denial of his motion to dismiss, holding that the "alleged defects even if assumed to be true do not rise to the level of being fundamentally unfair, thereby depriving him of due process. Failure to ensure that a potential deportee knows and fully understands each and every one of his rights under INS regulations is not a deprivation of fundamental fairness." Palacios-Martinez, 845 F.2d at 92. Although most of the court's opinion dealt with its conclusion that the alleged procedural deficiencies did not render the deportation proceeding fundamentally unfair, the court's observation that the immigration judge "specifically determined that none of the deportees were eligible for relief from deportation,"[14] indicates that the court also viewed the potential prejudice to the deportee as part of the equation for determining if the proceeding was fundamentally unfair.

The court applied the same two-part test in United States v. Zaleta-Sosa, 854 F.2d 48 (5th Cir. 1988). Zaleta-Sosa complained that he was not advised of his right to appeal an order of the immigration judge until the deportation hearing and that the immigration judge did not adequately explain his right to appeal. The court held that even if true, these complaints did not render the hearing fundamentally unfair. Zaleta-Sosa, 854 F.2d at 51-52.

_____

[14] Palacios-Martinez, 345 F.2d at 92.

-11-

The court also held that Zaleta-Sosa had failed to show any likelihood of avoiding deportation. <u>Zaleta-Sosa</u>, 854 F.2d at 52, n.5.[15]

Perhaps because the focus of our prior decisions was whether the underlying deportation proceedings were procedurally deficient, they do not explicitly state that a showing of fundamental unfairness also requires that the alleged procedural deficiencies caused actual prejudice to the defendant. Although a fair reading of our decisions submits to no other reasonable interpretation,[16] we now make manifest the requirement that a defendant must show actual prejudice to succeed in a collateral attack of his deportation. By a showing of prejudice, we mean that there was a reasonable likelihood that but for the errors complained of the defendant would not have been deported. This standard is consistent with our alternative holding in <u>Zaleta-Sosa</u> and with a large body of analogous case law dealing with collateral challenges to criminal convictions. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 694-697, 104 S.Ct. 2052, 2068-69 (1984).

---

[15] The district court order affirmed in <u>Zaleta-Sosa</u> held that the prior deportation could be used in a criminal prosecution because the defendant had not been denied due process at his deportation hearing <u>and</u> because he had not shown prejudice from the alleged procedural defects. <u>Zaleta-Sosa</u>, 854 F.2d at 50.

[16] Both the Ninth and Eleventh Circuits have read <u>Zaleta-Sosa</u> as requiring a showing of actual prejudice to succeed on a collateral challenge of a deportation order. <u>United States v. Proa-Tovar</u>, 945 F.2d 1450, 1453 (9th Cir. 1991); <u>United States v. Holland</u>, 876 F.2d 1533, 1536 (11th Cir. 1989).

-12-

Encarnacion-Galvez urges us to adopt instead the "bright-line rule" of United States v. Proa-Tovar, 945 F.2d 1450, 1453 (9th Cir. 1991), which dispensed with any requirement that a defendant show prejudice to succeed in a collateral attack on his deportation. The majority in Proa-Tovar held that because the INS deportation proceeding effectively foreclosed the defendant's right of judicial review, the government was automatically barred from using the deportation order in a subsequent criminal prosecution regardless of whether there were any errors in the procedure that led to the decision to deport the defendant. We decline Encarnacion-Galvez's invitation for several reasons. First, we must adhere to our precedent in Palacios-Martinez and Zaleta-Sosa, which requires a defendant to show that the procedural defects of which he complains prejudiced him before he can succeed in a collateral attack on his deportation. Second, even were we not bound by precedent, we find little to recommend the Ninth Circuit's per se rule.

Although acknowledging that all other circuits that had addressed the issue interpreted Mendoza-Lopez to require a showing of prejudice, and that the defendant before it "presents as weak a case as can be imagined for a showing of prejudice," Proa-Tovar, 945 F.2d at 1453, the majority in Proa-Tovar nevertheless dispensed with the requirement that the defendant show prejudice. The court concluded that a per se rule was more consistent with "a better reading of Mendoza-Lopez," would encourage the INS to protect the procedural rights of potential deportees, and would reduce the

-13-

burden on courts in resolving collateral challenges to deportation. _Proa-Tovar_, 945 F.2d at 1453-54. We are not persuaded by this rationale.

We find nothing in _Mendoza-Lopez_ to indicate that the Supreme Court intended to endorse a _per se_ rule that dispenses with any requirement that a deported defendant show prejudice. The Court did not have before it the issue of what procedural deficiencies in a deportation proceeding rendered it fundamentally unfair if collateral review were appropriate. The language from _Mendoza-Lopez_ cited by the _Proa-Tovar_ majority[17] deals with whether a complete deprivation of a deportee's right of judicial review entitles him to _mount_ a collateral challenge. It has nothing to do with his burden in _succeeding_ on such a challenge.

Nor are we persuaded by the Ninth Circuit's policy arguments for a _per se_ rule. A deportee's right to mount a collateral chal-lenge to his deportation already provides incentive to immigration judges to ensure that proper procedures are followed. _See Proa-Tovar_, 945 F.2d at 1455 (Farris, dissenting). We also see little aid to judicial economy under the Ninth Circuit's _per se_ rule since a court would still have to scrutinize the record of the immigra-tion proceeding to determine if a procedural defect existed. Even were the Ninth Circuit rule to provide some incremental deterrent to immigration judges or some reduction in the burden on the courts, we are concerned that such a _per se_ rule would frustrate

---

[17] 481 U.S. at 840, 107 S.Ct. at 2156.

-14-

other important considerations, such as the finality of INS proceedings and the requirement that an aggrieved alien pursue his administrative remedies in the intended and more appropriate forum, before the INS and through a direct appeal.

In criminal trials not all errors, even those of a "constitutional dimension," require a reversal. See Rose v. Clark, 478 U.S. 570, 576-77, 106 S.Ct. 3101, 3105 (1986). Yet the effect of the Ninth Circuit's per se rule would be to require more rigorous adherence to a defendant's procedural rights in an administrative proceeding, where the required procedures are normally less stringent, than in a criminal trial. As Judge Williams, writing for the court, explained in Palacios-Martinez, 845 F.2d at 92:

> In evaluating a criminal trial, the threshold for establishing that the trial was fundamentally unfair is quite high. The standard for evaluating a civil proceeding like deportation to establish the foundation for a criminal offense should be no lower.

We thus remain confident in the soundness of our precedent, which requires a showing that the procedural deficiency visited demonstrable harm on the defendant.

Having briefly defined the relevant law, we now apply it to Encarnacion-Galvez's appeal. The three arguments that underlie his claim of fundamental unfairness are all fact intensive: (1) whether he thought he was agreeing to voluntary departure instead of deportation, (2) whether he understood that by signing the "Statements" he waived the right ever to appear before an immigration judge, and (3) whether he did not understand his attorney's admonitions and

-15-

the "Statements" he signed because of his inability to read Spanish well and because he had to use an inmate interpreter. All of these questions were considered and resolved against Encarnacion-Galvez by the district court.

In pretrial matters the court reviews district court fact-findings based on live testimony under a clearly erroneous standard. United States v. Piaget, 915 F.2d 138 (5th Cir. 1990). Fact-findings are accepted unless they are clearly erroneous or influenced by an incorrect view of the law. Piaget, 915 F.2d at 140. When applying this standard of review, the court reviews the evidence in the light most favorable to the party that prevailed in the district court. Piaget, 915 F.2d at 140. A waiver is reviewed in this context under the totality of circumstances approach. United States v. Saucedo-Velasquez, 843 F.2d 832, 835 (5th Cir. 1988).

The testimony of Encarnacion-Galvez quoted above shows that Encarnacion-Galvez told the district court that he read the "Statements" and reviewed it with his attorney before he signed it. His attorney told him he could appear before a judge and fight the case, but that his chances of success were not "very big" because of his conviction for aggravated robbery, and that the process could take from six months to a year, while he remained in custody. His alternative was to sign the "Statements" waiving a right to a hearing. Encarnacion-Galvez testified that after this discussion with his attorney he signed the "Statements" waiving his right to

\91-1853.Op

a hearing. He specifically testified that he discussed the "Statements" with his attorney and read it before he signed it, although he also testified he thought he was only agreeing to "departure" to Mexico and did not realize that he would never appear before an immigration judge. When considered in the light most favorable to the government, we conclude that the district court's finding of a knowing and voluntary waiver of a hearing and consent to deportation was not clearly erroneous. We further conclude that even accepting Encarnacion-Galvez's version of the disputed facts, none of these procedural defects were of such a nature as to render his deportation proceeding fundamentally unfair. See Zaleta-Sosa, 845 F.2d at 51-52.

Moreover, even if we were to assume that the alleged procedural defects occurred and did render the deportation proceeding unfair, Encarnacion-Galvez would still be required to establish prejudice to succeed in his collateral attack on the deportation order. Encarnacion-Galvez never argued to the district court that he suffered any actual prejudice from the alleged procedural defects in the proceeding that led to his deportation.[18] Encarnacion-Galvez does not contend that the grounds for deportation in the Show Cause Order and deportation order are untrue. Nor does he contend that any basis existed for avoiding deportation.

In response to the government's brief before this court, Encarnacion-Galvez argued that under the immigration laws in

---

[18] Record Vol. 1 at pp. 44-49.

\91-1853.Op

existence at the time of his deportation, he "might have been entitled to some relief."[19]  Other than responding to government arguments about his inability to obtain relief from deportation under various immigration laws,[20] the only basis Encarnacion-Galvez affirmatively articulated for such relief is the discretionary asylum that the Attorney General may grant under 8 U.S.C. § 1253(h) to avoid persecution of an alien because of race, religion, nationality, or social or political affiliation if he were deported.  There is nothing in the record that even remotely suggests that Encarnacion-Galvez had any grounds for requesting such asylum, however, and because Encarnacion-Galvez was expressly deportable under 8 U.S.C. § 1251(a)(2) and (4), we find this

---

[19] Reply Brief at p. 8.  Encarnacion-Galvez argues alternatively that if a showing of prejudice is necessary, he need only show that the alleged errors "might have affected" the outcome of the deportation hearing, citing United States v. Holland, 876 F.2d 1533, 1536 (11th Cir. 1989).  We view any distinction between the prejudice test we have articulated and the one stated in Holland as one of semantics, not of substance, given the authorities cited by the Eleventh Circuit for its test and its actual holding, which the court couched in terms of whether the result "would" have been different in the absence of the alleged errors.  Assuming for argument's sake that the Holland threshold of prejudice is lower than ours, for the reasons stated below we conclude that Encarnacion-Galvez has not shown that he might have been entitled to relief from deportation.  See Holland, 876 F.2d at 1537.

[20] Encarnacion-Galvez articulated no basis for relief from deportation under these laws.  He was not eligible for suspension of deportation under 8 U.S.C. § 1254(a) as it existed at the time of his deportation because he had not been in the United States for the minimum time required.  Also, given his felony conviction, it is very unlikely that he would have been allowed either suspension under 8 U.S.C. § 1254(a) or voluntary departure under 8 U.S.C. § 1254(e) because both provisions required a showing of good moral character for various time periods of at least five years.

-18-

possibility to be far too slender a reed to support a showing of prejudice.  For all of these reasons we conclude that the district court did not err in denying Encarnacion-Galvez's motion to dismiss the indictment.

## The Motion to Suppress

Encarnacion-Galvez moved to suppress the evidence against him because it was obtained as a result of an unreasonable seizure in violation of the Fourth Amendment.  After an evidentiary hearing the district court denied the motion, holding that the contact between the Border Patrol agents and Encarnacion-Galvez was not a seizure requiring reasonable suspicion, but only a casual contact. The court further held that if the contact was a stop that required reasonable suspicion, the agents' experience and knowledge of the traits of illegal aliens met that requirement.[21]

Encarnacion-Galvez argues that the contact was a Terry[22] stop that must have been supported by reasonable suspicion.  He relies on United States v. Berry, 670 F.2d 583, 591 (5th Cir. Unit B 1982) (en banc), which held that a seizure occurs if, under all of the circumstances, a reasonable person would not have believed that he was free to leave.  Encarnacion-Galvez contends that when agent Torrez questioned him after Ramirez had stepped out of the vehicle, a reasonable person in his position would not have believed he was

---

[21] Record Vol. 2 at p. 39.

[22] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).

-19-

free to go because (1) agent Torrez did not inform Encarnacion-Galvez that he was free to leave and (2) Encarnacion-Galvez could not leave without Ramirez, who had left the vehicle. Encarnacion-Galvez also argues that although Torrez's identification as a law enforcement officer was not by itself sufficient to establish coercion, it contributed to Encarnacion-Galvez's belief that he was not free to leave.

"[A] district court's determination that a seizure has or has not occurred is a finding of fact subject to reversal only for clear error." United States v. Valdiosera-Godinez, 932 F.2d 1093, 1098, n.1 (5th Cir. 1991). Other than identifying themselves as Border Patrol agents, the agents made no display of authority. They did not stop Encarnacion-Galvez's vehicle, but approached it only after Encarnacion-Galvez had parked it. The agents did not park their vehicle in such a way that would block Encarnacion-Galvez's path if he chose to drive or walk away. The agents only asked Encarnacion-Galvez and Ramirez for identification and verification of their citizenship. We conclude that the dealings between the agents and Encarnacion-Galvez involved no coercion or detention, and that the district court's determination that no seizure occurred was not clearly erroneous.[23]

---

[23] Because we affirm the denial of Encarnacion-Galvez's motion to suppress on this basis, we do not address the district court's alternative basis for denying the motion.

-20-

## Conclusion

Because the district court did not err in denying either Encarnacion-Galvez's motion to dismiss the indictment or his motion to suppress, we AFFIRM the district court's judgment.

-21-